## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| B.R., an individual, | Case No. _____ |
| Plaintiff, | JUDGE _____ |
| v. | DEMAND FOR JURY TRIAL |
| HOLLIDAY-SIGHTS & SHEFFER INC. | |
| Defendant. | |

## COMPLAINT

Plaintiff B.R. ("Plaintiff" or "B.R.") respectfully submits this complaint under the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595 ("TVPRA") and the Child Abuse Victims' Rights Act, 18 U.S.C. § 2255 ("CAVRA"). B.R., by and through her undersigned counsel, makes the following averments, all upon information and belief.

## INTRODUCTION

1.      Plaintiff B.R. was a 15-year-old child when she was held hostage and sold for sex at a hotel owned, operated, maintained, and controlled by Defendant Holliday-Sights & Sheffer Inc. ("Holliday-Sights").

2.      B.R. was obviously a child under the coercive control of her trafficker when she was held prisoner in hotels owned, operated, maintained, and controlled by Defendant and their agents and employees. Defendant monitored and had control over each the property in which B.R. was trafficked. Yet Defendant and their agents and employees continued to rent rooms to B.R.'s trafficker, choosing to turn a blind eye to her suffering so that they could continue benefitting financially from B.R.'s trafficking.

3. Throughout Early 2014, at age 15, B.R. was forced to have sex against her will in Defendant's hotel rooms where she endured violence, trauma, exploitation, manipulation, threats, isolation, humiliation, and degradation. At Defendant's hotel, B.R. was repeatedly forced perform commercial sex acts with "buyers" or "johns" under threats of physical and psychological abuse. B.R. was raped multiple times per day by multiple men in Defendant's hotel rooms.

4. Defendant monitored the hotels and controlled the day to day activities at these hotels where there were numerous red flags of trafficking, including but not limited to: paying for stays in cash; paying for extended stays on a day-by-day basis; requesting certain rooms next to each other and away from other guests; obvious signs of illegal drug use; frequent requests for linen changes; unusually large numbers of used condoms in the trash; unusually large amounts of male visitors going in and out of B.R.'s room at all hours of the day and night; visible signs of physical abuse; women wearing clothing inappropriate for the weather; and loud noises of abuse and other violence audible to staff and/or other rooms.

5. These red flags were open and obvious to anyone working at the Defendant's hotel location for weeks. Thus, there is no doubt that Defendant knew, or at a minimum should have known, that they were profiting from B.R.'s trafficking.

6. At some point, B.R. was able to escape the grasps of her traffickers and the prison of the Defendant's hotel rooms. B.R. was rescued after law enforcement arrested her trafficker. Eventually, B.R.'s trafficker was convicted of trafficking both B.R. and her best friend, specifically out of the Sugar Creek Inn.

7. B.R. has spent a considerable amount of time attempting to regain the life that was stripped away from her by her trafficking. B.R. files this lawsuit seeking justice for the harm she suffered as a result of the heinous acts committed against her while she was being sold for

sex at Defendant's hotel. Defendant and their agents and employees all knew or should have known that they were benefitting from B.R.'s sex trafficking, yet turned a blind eye to her suffering.

## PARTIES

8.    Plaintiff B.R. is a natural person and a resident and citizen of Madisonville, Kentucky.

9.    B.R. is a victim of human trafficking pursuant to 22 U.S.C. § 7102(17) and (18) U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 11 U.S.C. § 7102(16).

    a. Due to the sensitive and intimate nature of the issues, B.R. requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym and to ensure that Defendant maintain the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after. [1]

    b. Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[2] However, there are exceptions when the issues involved are of a sensitive and personal nature. [3] For good cause, the Court

---

[1] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[2] Fed. R. Civ. P. 10(a).

[3] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

may issue an order to protect a part or person from annoyance, embarrassment, oppression or undue burden or expense.[4]

c. Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. B.R. fears the stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

d. B.R. should not be compelled to disclose her identity in order to maintain her privacy and safety. B.R.'s privacy interest substantially outweighs the customary practice of judicial openness.[5]

e. Moreover, Defendant will not be prejudiced. B.R. will agree to reveal her identity to Defendant for the limited purpose of investigating B.R.'s claims once the parties have entered into a protective order. B.R. simply seeks redaction of B.R.'s personal identifying information from the public docket and assurances that Defendant will not use or publish B.R.'s identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

10. **Defendant Holliday-Sights & Sheffer Inc. ("HSS")** is an incorporation organized under the laws of and operating within the State of Kentucky. It can be served by the hotel's two living owners, Ronald Sheffer, located at 966 Cherokee Road, Unit 103, Louisville, KY 40204, and Dale Sights, located at 950 Craig Drive, Henderson, KY 42420.

11. Upon information and belief, Defendant owned, operated and supervised the Sugar

---

[4] Fed. R. Civ. P. 26(c).
[5] *Does I thru XXIII, 214 F.3d* at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

Creek Inn beginning on or about February 1986. It is believed Defendant sold the property in about 2018.

12.     Defendant benefited from its operations at the Sugar Creek Inn in more ways than just through room revenue. Upon information and belief, Defendant gathered personal data from the Wi-Fi services it provided to guests, including both B.R. and her trafficker. This data collection provided further value to Defendant, enhancing its ability to market and promote its services while maintaining and promoting a positive public image for its property.

13.     Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation is that Defendant engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Sugar Creek Inn, where B.R. was trafficked.

## JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

15.     The Court has personal jurisdiction pursuant to the TVPRA and 18 U.S.C. § 2255, Child Abuse Victims' Rights Act ("CAVRA").

## OVERVIEW OF TRAFFICKING

16.     For decades, sex traffickers have brazenly operated in and out of hotels throughout this country. Traffickers paraded throughout hotels, while hospitality giants stood on the sidelines and did nothing. Instead, hotels and motels paid only lip service to campaigns against sex trafficking and stood by collecting millions in profits from their trafficking occurring on their properties.

17.     The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in so-called prostitution are subject to force, fraud, or coercion.[6] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

18.     The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendant understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendant knew or should have known that signs of commercial sex (prostitution) activity in their motel ere in fact signs of sex trafficking.[7]

19.     One of the founding documents of the United States, the Declaration of Independence, recognizes the inherent dignity and worth of all people. It states that all men are created equal and that they are endowed by their Creator with certain unalienable rights. The right to be free from slavery and involuntary servitude is among those unalienable rights. Acknowledging this fact, the United States outlawed slavery and involuntary servitude in 1865, recognizing them as evil institutions that must be abolished. Current practices of sexual slavery and trafficking of men, women and children are similarly abhorrent to the principles upon which the United States was founded." 22 U.S.C. § 7101(b)(22).

20.     Defendant knew and have known for years that it has profited from sex trafficking repeatedly occurring under its individually owned property. Rather than taking timely and effective

---

[6] See, e.g., A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; Prostitution and Trafficking in Women: An Intimate Relationship, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women intimate-relationship.

[7] *Id.*

measures to stop profiting from this epidemic, Defendant chose to ignore the open and obvious presence of sex trafficking on its individually owned property, benefitting from the profit and fees created by rooms rented and Wi-Fi provided for this explicit and apparent purpose.

21.     The sex trafficking industry alone pulls in an estimated $99 billion each year, making it the second largest illicit trade after the sale of all illegal drugs.[8] However, traffickers aren't the only profiteers. The hotel and motel industry, including Defendant, profits from participating in ventures that they know or should have known engage in violations of 18 U.S.C. § 1591(a)(1) through renting rooms where sex trafficking victims are harbored night after night and providing Wi-Fi that traffickers use to advertise and solicit victims for commercial sex acts. Defendant and traffickers have a mutually beneficial relationship, fueled by the sexual exploitation of victims.

22.     The widely known and pervasive relationship between sex trafficking and the hotel and motel industry necessarily shapes what Defendant knew or should have known regarding the trafficking of B.R. at Defendant's motel. 18 U.S.C. § 1595 (a).

23.     Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[9] This is no accident. For years, sex traffickers have been able to reap enormous profits with "little risk when attempting to operate within hotels."[10] In 2014, 92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at

---

[8] *Profits and Poverty: The Economics of Forced Labor,* INTERNATIONAL LABOR ORGANIZATION (2017), https://www.ilo.org/global/topics/forced-labour/statistics/lang--en/index.htm.

[9] "This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-traffickingusslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere."

[10] See Human Trafficking in the Hotel Industry, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

hotels.[11] Hotels have been found to account for over 90 percent of commercial exploitation of children.[12]

24. Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including the defendants, on best practices for identifying and responding to sex trafficking.[13]

25. Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and End Child Prostitution, Child Pornography, and the Trafficking of Children for Sexual Purposes ("ECPAT"), among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[14]

26. Widely recognized signs of sex trafficking, which can be observed by hotel staff all which Defendant's property was made of aware of, include but are not limited to:

    a. Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

---

[11] Michele Sarkisian, Adopting the Code: Human Trafficking and the Hospitality Industry, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wpcontent/uploads/2019/05/Adoptingthecode.report.cornell.pdf

[12] Erika R. George & Scarlet R. Smith, In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

[13] See, e.g., Department of Homeland Security, Blue Campaign Toolkit, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, Child Sex Trafficking Overview, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, Red Flags for Hotel and Motel Employees, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

[14] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023);National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, Red Flags for Hotel & Motel Employees, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, Human Trafficking Red Flags, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).

b.  Individuals show signs of physical abuse, restraint, and/or confinement;

c.  Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

d.  Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

e.  Individuals lack freedom of movement or are constantly monitored;

f.  Individuals avoid eye contact and interaction with others;

g.  Individuals have no control or possession of money or ID;

h.  Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

i.  Individuals have few or no personal items – such as no luggage or other bags;

j.  Individuals appear to be with significantly older "boyfriend" or in the company of older males;

k.  A group of girls appear to be traveling with an older female or male;

l.  A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

m.  Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

n.  Possession of bulk sexual paraphernalia such as condoms or lubricant;

o.  Possession or use of multiple cell phones; and

p.  Possession or usage of large amounts of cash or pre-paid cards.[15]

27.  The signs of sex trafficking in a hotel environment follow well-established patterns

---

[15] *Id.*

and can easily be detected by appropriately trained staff. Tool kits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[16] From check-in to check-out, there are indicators that traffickers and their victims exhibit during their stay at the hotel.

28.     The hospitality industry, speaking through industry organizations, has in recent years been increasingly vocal about its supposed "unified commitment" to combat human trafficking. Unfortunately, the near-total lack of concrete action by Defendant and the rest of the hospitality industry shows that the industry in fact has a "unified commitment" to the very opposite: continuing with business as usual, so that Defendant and all industry participants continue to profit thousands from participating in a venture in violation of § 1591(a).

29.     Defendant's decision to prioritize profits over protecting sex trafficking victims resulted in the repeated sexual exploitation and rape of Plaintiff B.R. on their property.

30.     B.R. is a survivor of sex trafficking. Key findings from the Polaris Project are that "[s]urvivors of human trafficking are not thriving. The systems that were supposed to protect them before, during and after their human trafficking situations failed and failed miserably. Systems such as child welfare, criminal justice and legal systems failed." https://polarisproject.org/national-survivor-study/

31.     B.R. looks to the judicial system, who has been empowered by Congress to provide a remedy to Victim-Survivors pursuant to the TVPRA, 18 U.S.C. § 1595 and 18 U.S.C. § 2255. Defendant knowingly benefitted from participation in a venture that it knew or should have known to be engaging in violations of 18 U.S.C. § 1595(a).

---

[16] Department of Homeland Security, Blue Campaign Toolkit,
https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

## FACTUAL BACKRGOUND

## INTRODUCTION

32.     B.R. met her trafficker at 15-years-old, when an older man contacted her on social media. Ultimately her trafficker came to control every aspect of her life. The defining factor of the relationship between B.R. and her trafficker, was that each night, B.R.'s trafficker forced her to have sex with men for money.

33.     B.R. brings her claims against the Defendant for violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") 18 U.S.C. § 1595(a) and the Child Abuse Victim's Rights Act ("CAVRA"), 18 U.S.C. § 2255 (a).

34.     The TVPRA prohibits Defendants from profiting from any venture they know or should know involves a violation of 18 U.S.C. § 1595 (a) and thereby establishes a non-delegable duty of reasonable care.

35.     CAVRA allows for any minor that suffers personal injury as a result of child sex trafficking to recover damages. 18 U.S.C. § 2255(a).

36.     An overwhelming majority of commercial sex trafficking transactions occur within the hotels, as traffickers use their rooms as the hub for their operations.[17] Hotels offer anonymity and non-traceability, privacy, and discretion, making them ideal venues sex trafficking. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex. In addition, traffickers regularly use Defendant's Wi-Fi to advertise and solicit victims for commercial sex against their will.

37.     As part of their conspiracy, to save costs and continually reap profits, Defendant generally failed to create, adopt, implement, and enforce company-wide policies and procedures

---

[17] Bradley Myles, *Combating Human Trafficking in the Hotel Industry*, HUFFINGTON POST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_ 7840754.

regarding suspected incidents of human trafficking at the independently owned property—despite the general knowledge in the industry and their own records that human sex trafficking was happening in the hotel industry and in their wholly and independently owned properties. Furthermore, Defendant did not train staff on how to identify and respond to suspected human trafficking, failed to require training of all employees on human trafficking policies and procedures, and failed to conduct audits confirming compliance with policies and procedures.

38.     Upon information and belief, Defendant kept no reports or data on suspected incidences or occurrences of human trafficking on their properties and the rate at which those occurrences decreased as a result of implementing human trafficking policies and procedures. Defendant did not establish mandatory and secure reporting mechanisms at the point of sale.

39.     Upon information and belief, despite the proven ability to respond to important societal issues such as COVID-19 by modifying the its standards to keep guests safe, Defendant did nothing in the face of the human sex trafficking epidemic in its industry. Instead, it continued to profit from the rental of rooms that it knew or should have known were rented and used for the purpose of sex trafficking.

40.     Upon information and belief, Defendant thus failed to act to ensure that it did not benefit from the human sex trafficking occurring at its independently owned property. Defendant failed to implement appropriate policies and procedures that a reasonably diligent business would or should have implemented so that it would not continue to benefit from the human trafficking occurring at its independently owned property.

41.     With little to no risk posed to traffickers seeking to use Defendant's rooms as a location to force victims like B.R. to engage in commercial sex against her will, the sex trade continues to thrive at Defendant's independently owned property while Defendant reap the

benefits.

42.     Plaintiff B.R.'s injuries are indivisible and cannot be separated. B.R.'s injuries are the result of continued instances of ongoing violent, traumatizing sexual exploitation.

43.     B.R.'s injuries are almost exclusively mental, emotional, and psychological in nature and derive from the trafficking period.

44.     Victims are entitled to all compensatory and non-compensatory damages incurred during their trafficking period. 18 U.S.C. § 1595(a).

## THE SEX TRAFFICKING OF B.R. AT THE SUGAR CREEK INN

45.     Upon information and belief, the following facts substantiate that Plaintiff B.R. was trafficked at Defendant's motel.

46.     B.R. met her trafficker when she was fifteen (15) years old.

47.     By means of a combination of force, coercion, violence, threats, manipulation, compelled use of and dependency on illegal substances, control over identification documents and possessions, and deprivation of basic survival necessities such as, but not limited to, food, water, transportation, shelter, and clothing, B.R. was held captive and sold for sex by her trafficker at Defendant's motel for nearly three (3) weeks.

48.     B.R.'s trafficker often threatened physical violence against both her and her family, had she not complied. He would refrain from giving her food and would feed her one small meal per day. Some days B.R. did not get food at all.

49.     During the time that she was trafficked, B.R.'s trafficker frequently rented rooms at the Defendant's motel location because the rooms provided convenient, anonymous, and relatively central locations for "johns" that would pay to engage in sex with B.R.

50.     Throughout her trafficking, B.R.'s trafficker connected with "johns" by posting or

causing to be posted advertisements on websites such as Backpage and Craigslist. These posts advertised for B.R.'s availability for commercial sex. B.R.'s trafficker presumably posted many of these advertisements and had conversations with "johns" while connected to Defendant's Wi-Fi.

51.     Plaintiff B.R. was subjected to sex trafficking at the Sugar Creek Inn located at 2077 US Highway 41 N, Henderson, KY 42420, continuously for a period of roughly three (3) weeks in March 2014.

52.     B.R. was forced to have sex with multiple men every day she was trafficked in Defendant's motel.

53.     While at Defendant's independently owned property, B.R.'s trafficker violently attacked and beat her, and psychologically tormented her by withholding food and water, all to ensure that she could not escape. Her deterioration and poor health conditions were obvious to anyone who saw her.

54.     During her captivity at Defendant's independently owned property, B.R. was raped, continuously abused physically and verbally, malnourished, psychologically tormented, kidnapped, and imprisoned.

55.     At the Defendant's motel, B.R. encountered the same staff on multiple occasions. Defendant's staff saw or should have seen the signs of B.R.'s deterioration brought on by the abuse perpetrated by her trafficker, including bruising and physical and verbal abuse occurring in public areas of Defendant's property as well as signs of malnutrition and poor health, all in an effort to insure that B.R. remained a victim of human sex trafficking.

56.     Every time B.R. interacted with the Defendant's staff, it was readily apparent that B.R. was under the control of her trafficker. B.R.'s trafficker checked in to Defendant's motel using his name.

57.     B.R.'s trafficker followed a repetitive and routine procedure during stays at the Defendant's independently owned property, and Defendant knew or should have known of B.R.'s trafficking because of a variety of factors detailed below.

58.     For approximately three (3) weeks, B.R.'s trafficker chose the Defendant's location as a hub for trafficking due to the relationship between her trafficker and the hotel employees that allowed her trafficker free reign to conduct their illegal trafficking business.

59.     Due to the relationships between Defendant's employees and B.R.'s trafficker, B.R. understood that the Defendant's motel staff, employees, and owners would not help her and that she would likely be beaten or killed if she sought help from them.

60.     B.R.'s trafficker had a very friendly relationship with one of the owners at the Sugar Creek Inn. B.R. believes that the day her trafficker was arrested at the Sugar Creek Inn, the owner gave a statement to police on behalf of her trafficker, vouching that he was a good man.

61.     Staff at the Defendant's motel saw and heard the fights occurring on their property, including but not limited to involving B.R. and her trafficker, but did not call the police or intervene in anyway to help.

62.     There was constant foot traffic going in and out of the rooms rented by B.R.'s trafficker.

63.     During the time B.R.'s trafficker held her captive at the Defendant's motel, Plaintiff's trafficker or Plaintiff was forced to ask for excessive amounts of linens and towels throughout their stays as a direct result of the trafficking.

64.     Each stay at the Defendant's motel location resulted in several consistent red flags, including but not limited to: paying for stays in cash; paying for extended stays on a day-by-day basis; requesting certain rooms next to each other and away from other guests; obvious signs of

illegal drug use; unusually large numbers of used condoms in the trash; unusually large amounts of male visitors going in and out of B.R.'s room at all hours of the day and night; visible signs of physical abuse; women wearing clothing inappropriate for the weather; loud noises of abuse and other violence audible to staff and/or other rooms; and loitering or soliciting on hotel grounds.

65.     These red flags were open and obvious to anyone working at the Defendant's motel location and lasted for nearly a month. This constitutes actual knowledge that Plaintiff B.R. was being trafficked at Defendant's motel.

66.     B.R. consistently witnessed clear signs of others being sex trafficked at the same times she was trafficked at the Defendant's motel, meaning it should have been easily detectible upon reasonable inspection.

67.     It became clear to B.R. during the time of her trafficking that her trafficker and the Defendant's sex trafficking operation was a routine business operation, and the motel was welcoming and participating in the exploitation of B.R.

68.     At the time B.R. was trafficked at the Defendant's motel, staff saw B.R. being held captive, controlled, drugged, abused, hit, and trafficked for sex there. Defendant and their employees directly witnessed all signs of sex trafficking, including the trafficking of B.R., as described above.

69.     Defendant knew or should have known staff at its property was participating in and facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at their property, including but not limited to not implementing policies and procedures known to be necessary to stop known trafficking; allowing daily payments of cash for extended stays; complying with requests for rooms to be rented away from other guests; allowing traffickers to escort bruised and battered women to rooms; allowing many "johns" to come in and

out of the rooms where victims were trafficked in; allowing guests to use illicit drugs on property; allowing guests to carry weapons on the property; ignoring large amounts of sex paraphernalia; not addressing trafficking signs and reports of drugs, abuse, and prostitution; forming relationships with traffickers and treating traffickers with benefits by accommodating specific requests that entail known signs of trafficking and not reporting the trafficking to authorities or taking any steps to prevent it at their properties.

70.     Defendant had and has direct access to reviews left by guests on websites wherein guests frequently complain about the prevalence of obvious trafficking, hearing physical violence by traffickers, and other signs of trafficking.

71.     During B.R.'s trafficker's criminal proceeding, he admitted to trafficking B.R. and her best friend out of the Sugar Creek Inn. [18]

## CAUSES OF ACTION

### COUNT 1: 18 U.S.C. § 1595 ("TVPRA") (AGAINST ALL DEFENDANTS)

72.     Plaintiff incorporates each foregoing allegation in paragraphs 1 through 71.

73.     Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

74.     Furthermore, Defendant's acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Defendant had a statutory obligation not to benefit financially or receive anything of value from a venture that they knew, or should have known, engaged in violating the TVPRA. At all relevant times, Defendant breached this duty by facilitating violations of the TVPRA through their participation in the harboring, maintaining, soliciting, and advertising of B.R. and her trafficker for the purposes

---

[18] https://www.kfvs12.com/story/30475376/ky-man-sentenced-to-10-years-for-human-trafficking/

of commercial sex induced by force, fraud, or coercion.

75.     Defendant has continued to benefit as a result of these acts, omissions, and/or commissions by renting rooms and providing Wi-Fi to traffickers and customers, keeping operating costs low, maintaining the loyal customer base that fuels the supply and demand of sex trafficking, and limiting mandatory regulations. Moreover, on each occasion, they received payment for rooms or kickbacks from internet usage, contributing to their direct financial benefit from the sex trafficking of B.R. when they knew or should have known that violations of §1595(a) were occurring.

76.     Despite Defendant's knowledge of B.R.'s sex trafficking, B.R.'s trafficker was able to continue renting rooms for the sexual exploitation of B.R.

77.     Defendant had an ongoing business relationship and association in fact with B.R.'s trafficker. Despite knowing or having reason to know that B.R. was being sex trafficked in violation of the TVPRA, Defendant continued to rent rooms to her trafficker, providing a secure venue for B.R.'s sexual exploitation. B.R.'s sex trafficker used Defendant's motel because they knew that staff members looked the other way despite obvious signs of trafficking. Each of the venturers shared a common purpose – the rental of hotel rooms and the making of profits. Defendant profited while B.R.'s trafficker was able to rent a secure venue to earn profits by trafficking B.R. Defendant participated in the venture by continually renting rooms to B.R's traffickers, failing to properly implement anti-trafficking rules and policies, and assisting traffickers to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of B.R.'s trafficking.

78.     Defendant's failure to train and supervise their agents and employees, as well as their disregard for the welfare of their guests, including B.R., enabled and contributed to her sex

trafficking.

79.     The facts alleged establish that Defendant knowingly benefited, financially or by receiving anything of value, from participating in a venture that Defendant knew or should have known has engaged in an act in violation of the TVPRA.

80.     Plaintiff B.R. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Defendant's motel.


### COUNT 2: 18 U.S.C. § 2255(A) CHILD ABUSE VICTIMS RIGHTS ACT ("CAVRA")

81.     Plaintiff incorporates each forgoing allegation.

82.     Plaintiff was a "minor" pursuant to 18 U.S.C. § 2255(a) when she was trafficked.

83.     Plaintiff was the "victim" of violations of 18 U.S.C. §§ 1589, 1590, and 1591.

84.     Plaintiff suffered "personal injury" pursuant to 18 U.S.C. § 2255(a) as a result of those violations.

85.     Plaintiff was a "person" who "has not attained the age of 18 years" pursuant to 18 U.S.C. § 1591(a)(2).

86.     Defendant knew or should have known that means of force, threats of force, fraud, coercion, or any combination of those means would be used to cause Plaintiff to engage in a commercial sex act, pursuant to 18 U.S.C. § 1591(a)(2).

87.     Defendant knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited Plaintiff, pursuant to 18 U.S.C. 1591(a)(1), by providing her and her trafficker rooms in hotels and Wi-Fi used advertise Plaintiff and solicit customers affecting interstate commerce where authorities were unlikely to discover the injuries being sustained by Plaintiff.

88.     Defendant knowingly benefited, financially or by receiving anything of value, from participation in ventures of renting rooms and providing Wi-Fi that recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited Plaintiff to engage in commercial sex acts.

89.     Defendant engaged in a conspiracy to ignore and actively refrain from engaging in any conduct that would prevent them from profiting from sex trafficking at their branded properties.

90.     Wherefore, by reason of the foregoing, Defendant is liable to Plaintiff for compensatory damages and for punitive damages, in the amount to be determined at trial, together with interest and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a.     Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b.     Disgorgement of profits obtained through unjust enrichment;

c.     Restitution;

d.     Statutory and/or treble damages, where available;

e.     Punitive damages;

f.     Attorneys' fees and expenses;

g.     The costs of this action;

h.     Pre- and post-judgment interest; and

i.      Any other relief the Court or jury deems appropriate.

## **JURY DEMAND**

Plaintiff hereby demands a trial by a struck jury.

Dated: August 6, 2025

Respectfully submitted,

*/s/ Jeremy W. Hoshor-Johnson*
Jeremy W. Hoshor-Johnson (0075502)
Penny L. Barrick (0074110)
Steven C. Babin, Jr. (0093584)
Babin Law, LLC
10 West Broad Street, Suite 900
Columbus, Ohio 43215
T: 614-761-8800
E: Steven.babin@babinlaws.com /
Jeremy.hoshorjohnson@babinlaws.com /
Penny.barrick@babinlaws.com